Frances A. NELSON, Plaintiff,

v.

BANK OF BOSTON, N.A., as Trustee of the Cape Ann Tool Company Profit Sharing Plan, Nancy E. Nelson, Erik R. Nelson, and Frederick A. Valente, Defendants.

Civ. A. No. 87–1858–T.

United States District Court, D. Massachusetts.

Oct. 24, 1988.

Alfred D. Ellis, Cherwin & Glickman, Boston, Mass., for plaintiff.

James B. Krasnoo, Norris, Kozodoy, Krasnoo & Fong, Boston, Mass., for defendants.

Ruah Donnelly Lahey, Francis H. Fox, Bingham, Dana & Gould Boston, Mass., for First Nat. Bank of Boston & Cape Ann Tool Co. Profit Sharing Plan.

Andrew F. Lane, Gaston & Snow, Boston, Mass., for Nancy & Erik Nelson.

## MEMORANDUM

TAURO, District Judge.

Robert Nelson, now deceased, worked at the Cape Ann Tool Company ("Company") starting in 1959. During the course of his employment, Nelson participated in the Company's Profit Sharing Plan ("Plan"). He died on June 2, 1985 after having resigned from the Company effective September 30, 1984. This case is a contest between Erik and Nancy Nelson, Robert Nelson's children from his first marriage ("defendants"), and Mrs. Frances Nelson, Nelson's second wife ("plaintiff")[1], over who is entitled to the approximately $300,000 left of Nelson's share of the Plan account.[2]

## I.

Plaintiff was designated by Nelson as his beneficiary under the Plan on April 16, 1984. The Nelsons separated shortly thereafter and plaintiff moved to Florida. On September 4, 1984, Nelson signed another beneficiary designation form. This one named his children, the defendants, as equal beneficiaries. Under the Plan, a valid designation automatically revoked any prior designation. The issue here is whether the second designation was valid.

Resolution of the dispute between the parties depends on a determination as to the effective date of the Retirement Equity Act of 1984, 29 U.S.C. § 1001 *et seq.* (1988) ("REA"). If REA was effective on the date of the second designation, then that designation would be void and plaintiff would be entitled to the proceeds of the Plan account. If, however, REA was not yet effective, the proceeds of the Plan account would be distributed to defendants as the last designated beneficiaries of Nelson.

Both designations were made while Nelson was on a paid leave of absence that had started on September 12, 1983 and continued until his retirement on September 30, 1984. The parties agree that Nelson never returned to work from his leave of absence, and that he did not perform any work for the Company during 1984. Upon his retirement, Nelson elected to receive his share of the Plan proceeds in monthly installments. The payments started in November 1984 and were to continue until 1999. Nelson died on June 2, 1985, survived by both plaintiff and defendants.

After Nelson's death, the Company Profit Sharing Committee ("Plan Committee") determined that defendants, as beneficiaries under Nelson's last unrevoked beneficiary designation form, were entitled to receive the unpaid funds. Following that determination, plaintiff filed this lawsuit alleging that REA's spousal consent rules invalidated the designation of defendant.[3]

---

1. Mr. and Mrs. Nelson were separated sometime in the spring of 1984. Nevertheless, there is no dispute that plaintiff was Nelson's spouse for purposes of the Retirement Equity Act of 1984 ("REA").

2. The company liquidated in 1987.

3. Initially, this lawsuit was dismissed because plaintiff failed to exhaust her administrative remedies by making a claim for benefits upon the Plan Committee. *See Nelson v. Bank of Boston,* CA No. 87–1858–T, slip op. at 2 (D.Mass. November 20, 1987). Subsequently, she made a claim for benefits which the Plan Committee

Because the applicability of REA's spousal consent rules is a legal question, both sides have moved for summary judgment.

## II.

### A. The Regulation of Profit Sharing Plans

Profit sharing and pension plans are regulated by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1985) ("ERISA") and the Internal Revenue Code of 1954, 26 U.S.C. § 1 *et seq.* (1985) ("IRC"). For a plan to be qualified under these provisions, it must contain survivorship provisions. If the plan participant dies after his annuity starting date, benefits must be provided in the form of a qualified joint and survivor annuity ("QJSA"). If a participant dies before his annuity starting date, benefits must be provided in the form of a qualified preretirement survivor annuity ("QPSA"). *See* 26 U.S.C. § 401(a)(11)(A) (1985). As an alternative to providing QJSA's and QPSA's, a plan can simply provide for the payment of all benefits to the surviving spouse upon the death of the plan participant. 26 U.S.C. § 401(a)(11)(B) (1985). Because Nelson died after retirement, his situation is more closely analogous to a QJSA.

That does not end the inquiry, because REA added a new wrinkle to the pension plan regulatory scheme. REA mandated that, regardless of the form of the benefits, they must be payable to the surviving spouse upon the participant's death, unless the spouse consented to a different designation. *See* 26 U.S.C. § 417(a)(2) (1985) (IRC) and 29 U.S.C. § 1055(c)(2) (1985) (ERISA). Prior to enactment of REA, no spousal consent was required to change beneficiaries.

### B. REA's Effective Date

The general rule for determining the effective date of REA is contained in § 302 which states: "Except as otherwise provided in this section or section 303, the amend-

ments made by this Act shall apply to plan years beginning after December 31, 1984." § 302(a) Pub.L. No. 98–397, 98 Stat. 1451 (codified as a historical note to 29 U.S.C. § 1001 (1985)) ("REA § 302").[4] Applying this general rule, defendants would be entitled to the disputed funds, because both their designation and Nelson's retirement would have occurred before REA's effective date.

Plaintiff, however, contends that the transitional rule contained in § 303(c)(1) mandates an earlier effective date for this case. That section provides:

> (c) Requirement of joint and survivor annuity and preretirement survivor annuity.—
>
> (1) Requirement that participant have at least 1 hour of service or paid leave on or after date of enactment.—The amendments made by sections 103 and 203 [the spousal consent rules] shall apply only in the case of participants who have at least 1 hour of service under the plan on or after the date of the enactment of this Act or have at least 1 hour of paid leave on or after such date of enactment.

§ 303(c)(1) Pub.L. No. 98–397, 98 Stat. 1451 (codified as a historical note to 29 U.S.C. § 1001 (1985)) ("REA § 303").

Section 303(c)(1) provides an exception to REA's general effective date for any plan participant who has either one hour of service under the plan or one hour of paid leave after REA's enactment date of August 23, 1984. The parties agree that Nelson did not perform any services for the Company after having been placed on a leave of absence on September 12, 1983. They disagree, however, on whether Nelson must be credited with one hour of paid leave under § 303(c)(1).

Plaintiff contends that § 303(c)(1) mandates application of the spousal consent rules to anyone who had even a single day of paid leave after August 23, 1984. She points to the following undisputed facts to

---

rejected. The case is now ripe for a decision on the merits.

**4.** The Cape Ann Tool Company Profit Sharing Plan operated on a calendar year. Consequently, REA's effective date under § 302, as applied to the Company, was January 1, 1985.

argue that Nelson had at least one hour of paid leave after REA's date of enactment: 1) Nelson received his full salary during his leave of absence which continued until September 30, 1984, five weeks after REA's date of enactment; 2) Nelson contributed to the profit sharing plan during the first two quarters of 1984 (although he did not contribute anything during the last two quarters of 1984 and did not receive any allocation from the Company for 1984) and he received a credit to his account for investment gain of $28,223 for 1984; and 3) certain contemporaneous Plan documents indicate Nelson was an active Plan participant until September 30, 1984. Each of these contentions merit consideration.

### 1. Effect of Paid Leave

■ To support her contention that a single hour of paid leave after REA's date of enactment requires application of REA's spousal consent rules, plaintiff relies upon the district court's decision in *Manitowoc Engineering Co. v. Powalisz*, No. 85–C–534, slip op. (E.D.Wis. January 20, 1987) [available on WESTLAW, 1987 WL 49391]. In *Manitowoc*, the decedent was on a paid sick leave and died five days after REA was enacted. Because the decedent had not yet retired, the case was analogous to a QPSA, not to the QJSA scenario before this court. Although *Manitowoc* did award the plan proceeds to the spouse, it did so in reliance upon REA § 303(c)(2), a section of the Act not applicable to the case at bar.[5] *Manitowoc*, therefore, is inapposite.

This court does not agree with plaintiff that § 303(c)(1) was meant to apply REA's spousal consent rules to anyone who was on a paid leave of absence on the date of REA's enactment. The treasury regulations make clear that the "one hour of paid leave" language in § 303(c)(1) only refers to time which is required to be recognized by the plan. The regulations provide:

Q–19: What is one hour of service or paid leave under the plan for purposes of

the transition rules in section 303 of REA '84?

A–19: One hour of service or paid leave under the plan is one hour of service or paid leave *recognized or required to be recognized under the plan for any purpose, e.g.,* participation, vesting percentage, or benefit accrual purposes.

26 C.F.R. § 1.401(a)11T Q & A 19 (1988) (emphasis added). The proper focus in this case, therefore, is not whether Nelson was on the Company payroll after REA's date of enactment. Rather, the issue is whether his compensated time was recognized by the Profit Sharing Plan or required to be so recognized.

Nelson's profit sharing rights were fully vested prior to his leave of absence. Whether any of the leave of absence after REA's enactment was required to be recognized for some other purpose requires an interpretation of the Plan itself. Section 2.1(aa)(2), contained in amendment 9, is the Plan's time credit provision. It requires each employee who is on paid leave to only get credit for 501 hours of recognized time each year, regardless of how long they are on leave.[6] These 501 hours are to be calculated and credited according to 29 C.F.R. § 2530.200b2(c)(2)(i) (1988) (emphasis added) which provides:

Hours of service credited to any employee on account of a payment which is calculated on the basis of units of time such as hours, days, weeks or months, shall be credited to the computation period or computation periods in which the period during which no duties are performed occurs, *beginning with the first unit of time to which the payment relates.*

Applying the Plan language and the labor regulation, Nelson was only required to be credited with 501 hours in order to remain a participant in the Company Plan. This time was to be credited starting on January 1, 1984 and continuing until the 501 hours were used up. Assuming the

---

5. § 303(c)(2) by its terms only applies to a "preretirement survivor annuity ... in case of certain participant[s] dying on or after the date of [REA's] enactment."

6. These 501 hours permit an employee to continue his participation in the Plan, but does not entitle an individual on leave to obtain a contribution to the Plan from the Company.

traditional 40 hour work week, Nelson's 501 hours were credited before April 1984. None of Nelson's paid leave after that date was required to be recognized by the Plan for any purpose.[7]

#### 2. Effect of Personal Contributions and Investment Gain

■ Plaintiff contends that Nelson's personal contributions to the Plan for the first two quarters of 1984 and his receipt of investment gain for 1984 indicate that he actually had recognizable time under the Plan after REA's effective date. Nelson's personal contributions to the Plan are of no moment, as they ceased prior to REA's enactment.[8] Similarly, his continuing receipt of investment gain throughout 1984 does not make him an active Plan participant with recognizable paid leave. According to §§ 3.3 and 5.2(a) of the Plan, everyone with funds held by the Plan is entitled to investment gain credit even after ceasing to be a Plan participant.

#### 3. Interpretation of Plan Documents

■ Finally, plaintiff argues that certain Plan documents prove that Nelson was an active Plan participant and actually received credit for time after August 23, 1984. Specifically, plaintiff points to a census of Plan participants and the Plan Committee's payment authorization form. The Plan census lists Nelson's "Term. Date" as September 30, 1984. The payment authorization form lists Nelson's "Date of Change" as September 30, 1984 and credits him with 1440 hours for 1984. Plaintiff maintains that these documents prove that Nelson was an active Plan participant until September 30, 1984 and, therefore, had recognized time after August 23, 1984.

Plaintiff made these same arguments to the Plan Committee when she submitted a benefit claim. The Committee concluded that both references to September 30, 1984 meant the date of Nelson's resignation not his Plan termination date. Additionally,

the Committee found the 1440 hours of credit for 1984 to be a clerical error. The correct figure that should have been credited was the 501 hours already discussed above.

Section 8.5(a) (emphasis added) of the Plan document gives authority to the Plan Committee "to construe and interpret the Plan, *decide all questions* of eligibility and determine the amount, manner and time of payment of any benefits hereunder". Moreover, § 8.3 sets up a claim procedure that includes the opportunity to present a claim for benefits to the Committee and the right to obtain a written decision. The Plan does not provide for judicial review of the Committee's determinations. Consequently, any factual dispute between the parties over the appropriate meaning of the contested Plan documents has long since been definitively resolved by the Plan Committee. There is, therefore, no genuine issue of material fact that might affect the outcome of the litigation. *See Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1975).

None of Nelson's leave of absence after April 1984 was required to be recognized under the Plan for any purpose. Consequently, § 303(c)(1)'s earlier effective date for REA's spousal consent rules is inapplicable to Nelson's designation of defendants as his beneficiaries. The general effective date of January 1, 1985 controls. Having retired from the Company prior to REA's effective date, Nelson was not required to obtain his wife's consent to designate the defendants as his beneficiaries.

#### III.

■ Notwithstanding this court's determination that the January 1, 1985 effective date contained in REA § 302 is controlling, plaintiff argues that certain amendments to the Plan mandate a different result. This court disagrees.

On August 1, 1985, amendment 7 was adopted. It made changes in the Plan man-

---

**7.** This court rejects plaintiff's unsupported notion that the 501 hours must be spread ratably over the entire year. Neither the labor regulations nor any other authority supports her interpretation.

**8.** Nelson's last personal contribution to the Plan was for the quarter ended June 30, 1984. REA was enacted August 23, 1984.

dated by REA, the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") and the Deficit Reduction Act of 1984 ("DEFRA"). The effective date for all these changes was January 1, 1984. Subsequently, the Plan Committee realized that REA did not mandate an effective date for its changes until January 1, 1985, although both DEFRA and TEFRA required the earlier effective date. Consequently, on January 22, 1986, amendment 8 was adopted. This amendment changed the effective date of the REA-mandated provisions contained in amendment 7 from January 1, 1984 to January 1, 1985.

Plaintiff argues that amendment 8 cannot be given retroactive effect because to do so would violate § 8.5 of the Plan which provides that the Plan Committee has no power to amend the Plan while considering a claim for benefits. Plaintiff contends that her October 21, 1985 letter to Mr. Valente, a member of the Plan Committee, constituted a claim for benefits, thus depriving the Committee of the power to give amendment 8 retroactive effect. The flaw in plaintiff's analysis is that this court has already held that the October 21, 1985 letter did not constitute a claim for benefits. *See Nelson v. Bank of Boston,* CA No. 87–1858–T, slip op. at 2 (D.Mass. November 20, 1987) (dismissing the case for failure to exhaust administrative remedies). Since plaintiff's letter was not a claim for benefits, the Plan Committee had authority to give amendment 8 retroactive effect. Consequently, plaintiff cannot claim that the REA-mandated amendments were effective on January 1, 1984.

## IV.

 Finally, plaintiff contends that even if the amended Plan's REA provisions were not effective until January 1, 1985, after that date the transitional rules discussed above do not apply and the amended Plan is controlling. Effectively, plaintiff's argument is that once a Plan is amended to comply with REA, the Plan's spousal consent rules apply to any Plan participant living after the effective date of the Plan, even if the non-spouse designation was made before the effective date of the Plan.

Plaintiff relies upon four cases to support her position. *See Naddeo v. Officers and Employees Pension Plan,* 637 F.Supp. 82 (E.D.Pa.1986); *Binks v. Casaletto–Burns,* 657 F.Supp. 668 (N.D.Ill.1986), *aff'd in part and dismissed in part,* unpublished opinion, *noted in* 822 F.2d 1090 (7th Cir.1987); *Donohue v. Shell Provident Fund,* 656 F.Supp. 905 (S.D.Tex.1987); *Art Builders Profit Sharing Plan v. Bosely,* 649 F.Supp. 848 (D.Md.1986). None of these cases, however, support her theory. All four cases involved an employee who was actively performing services for the company on the date of his demise, rather than a retired individual or one on sick leave. In none of the cited cases is there any question that the employees had the one hour of service required by § 303(c)(2).[9] Although in all four cases the court applied the REA provisions of the plan, it did so only after finding that the transitional rules applied. This court has already found that the transitional rules do not apply. Consequently, there is no justification for applying the REA-mandated Plan amendments to Nelson's post-retirement death.

An order will issue.

## ORDER

Plaintiff's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is hereby DENIED. Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is hereby GRANTED. Accordingly, defendant Bank of Boston, N.A., as trustee of the Cape Ann Tool Company Profit Sharing Plan, is hereby ORDERED to pay the funds in dispute to defendants Nancy E. and Erik R. Nelson.

IT IS SO ORDERED.

---

**9.** Because these employees had not yet retired, the applicable transitional rule was § 303(c)(2) which applies to QPSA's rather than § 303(c)(1), applicable to QJSA's, that has been discussed above.