Dolores NADDEO

v.

OFFICERS AND EMPLOYEES PENSION PLAN OF LAUNDRY, DRY CLEANING & DYE WORKERS' INTERNATIONAL UNION.

and

Charles S. NADDEO,
Intervening Plaintiff,

v.

OFFICERS AND EMPLOYEES PENSION PLAN OF LAUNDRY, DRY CLEANING & DYE WORKERS' INTERNATIONAL UNION and Dolores Naddeo.

Civ. A. No. 85–2599.

United States District Court,
E.D. Pennsylvania.

May 30, 1986.

Thomas A. Leonard, Philadelphia, Pa., for plaintiff.

Jacob P. Hart, Philadelphia, Pa., for Chas. Naddeo, intervenor.

R. David Walk, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Pending before me are cross-motions for summary judgment filed by plaintiff Dolores Naddeo and intervenor Charles S. Naddeo in this case involving construction of the Retirement Equity Act of 1984 (the Act). Both parties seek to recover the entire amount of pension benefits due as the result of the death of Charles J. Naddeo, who was the husband of plaintiff and the father of intervenor. As explained below, my interpretation of the Act calls for the parties to split the sum (approximately $190,000) from decedent Naddeo's account.

## I. INTRODUCTION

There is no dispute as to the facts in this case, and both parties agree that summary judgment is appropriate. My decision hinges solely on narrow questions of statutory interpretation of the Act and of its transitional rules, Pub.L. No. 98–397, § 303, 98 Stat. 1451 (1984). There is also no dispute that defendant Officers and Employees Pension Plan of Laundry, Dry Cleaning & Dye Workers' International Union (the Plan) must pay approximately $190,000 to decedent's beneficiary or beneficiaries. I have, therefore, with the consent of the parties, dismissed the Plan from this action, ordering it to pay the balance of decedent's account into the registry of the court.

## II. FACTS

Decedent, an officer in the Laundry, Dry Cleaning & Dye Workers' International Union, participated in the union's pension plan. Contributions were made to an individual account on decedent's behalf. It was envisioned that, upon decedent's retirement, the amount in his account would be used to purchase a joint and survivor annuity for the benefit of decedent and of his spouse. However, decedent died on December 24, 1984, before retirement but after his pension rights had vested.

Under the terms of the plan in existence at the time of decedent's death, the entire amount in his account was to be treated as a death benefit and was to be paid to whomever decedent had chosen as his beneficiary. In accordance with this plan (the 1977 version), decedent had named his son Charles S. Naddeo as his beneficiary. Decedent made this designation in the spring of 1984, after his marriage to his second wife, Dolores Naddeo. Looking solely at the terms of the 1977 plan, intervenor is entitled to the full amount in his father's account.

However, Congress took action in the summer of 1984 that complicates and confuses this matter. On August 23rd of that year—after decedent had selected his beneficiary but before he died—Congress passed the Retirement Equity Act. The Act amended the Employee Retirement Income Security Act (ERISA) to require a "qualified preretirement survivor annuity" (QPSA). 29 U.S.C.A. § 1055(e) (1985). In order to provide benefits for a surviving spouse of a participant who dies while in active service but after having reached retirement age, the Act mandates that the pension plan pay to the spouse a survivor annuity. The Act defines this annuity or QPSA as equivalent to no less than 50% of the value of the participant's account. Only with his spouse's written consent,

may a participant bypass the QPSA requirement and designate someone other than his spouse to receive the entire amount of a death benefit. § 1055(c)(2)(A). Decedent was never informed about the new QPSA rules, and took no action to obtain a spousal waiver.[1]

Under section 302 of the Act, ERISA amendments, including the QPSA requirement, are applicable "to plan years beginning after December 31, 1984." But section 303 sets out transitional rules which are to govern in the event that a qualified participant "dies on or after the date of the enactment of this Act and before the first day of the first plan year to which the amendments made by this Act shall apply." § 303(c)(2). In other words, the transitional rules apply to those, such as decedent, who died after passage of the Act but before his employer had a chance to amend its plan. In these situations, the transitional rules mandate that the QPSA amendments "shall be treated as in effect as of the time of such participant's death." *Id.* Looking solely at the terms of the Act, it appears that the parties are each entitled to 50% of the balance of decedent's account.

However, following decedent's death, the Plan took action that further complicates and confuses this dispute. On September 16, 1985, the Plan trustees amended their 1977 plan to incorporate the requirements of the Act. The trustees not only complied with the Act with regard to the QPSA, but went further and defined the QPSA as an amount equal to 100% of the participant's account. (The Act defined the QPSA as not less than 50% of the account, but set no upper limit on it.) The 1985 version of the plan was made retroactive to January 1, 1984, although the spousal consent provision was made effective as of January 1, 1985. Section 7.2(d). Plaintiff contends that under this version of the plan she is entitled to 100% of her late husband's benefits.

1. On July 18, 1985, the Internal Revenue Service adopted a temporary regulation, giving plans until December 31, 1985 to notify participants of the QPSA and waiver rules, in cases where participants were over 35 on the date of the

## III.  DISCUSSION

Since it is uncontroverted that there is no genuine issue as to any material fact, summary judgment is appropriate here. Fed. R.Civ.P. 56(c); *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). Furthermore, since the case turns wholly on a question of statutory interpretation, summary judgment is especially warranted. This legal question is one of first impression, so I must construe the transitional rules without the benefit of precedent.

### A.  *Transitional Rules*

As this case proves and as legislators have now recognized, the transitional rules are ambiguous. *See* Intervenor's Trial Brief at 10 (citing legislation that has been introduced to clarify Act's ambiguity). Section 303 might be interpreted to allow dual recovery in a case in which there is a surviving spouse as well as another previously designated beneficiary. This result would surely not be what Congress had intended. Accordingly, fairness dictates that the transitional rules be read with the following understanding: any amount paid out as a QPSA must be deducted from the balance owing to the named beneficiary.

Intervenor contends that the confusion surrounding the language of the transitional rules requires that I apply the unambiguous terms of the 1977 plan—the one in effect when his father died—under which he would recover the full $190,000. Yet, there can be no confusion that Congress intended to apply the QPSA requirement to interstitial cases such as this one; that is the entire purpose of the transitional rules. If Congress had wished unamended plans to govern for deaths occurring during the second half of 1984, it would not have needed to enact the transitional rules, and it surely would not have said that the QPSA requirement applies in such situa-

Act's enactment. Treas.Reg. § 1.401(a)–11T (Q–30) (1985). Obviously, decedent never received notification under this provision, since it was promulgated after his death.

tions. Accordingly, I can say with some certainty (as much certainty as is possible in a legislative intent analysis) that Congress intended the QPSA rule to apply to the dispute before me. Plaintiff thus properly lays claim to no less than 50% of the amount in controversy.

### B. *The 1985 Plan*

What I must next determine is whether the amended version of the plan authorizes the payment of 100% of decedent's account to his surviving spouse. If decedent had died a few days later—that is, during 1985 —plaintiff would have a stronger claim to the entire sum, for the 1985 plan defines the QPSA as 100% of the participant's account. But as intervenor correctly points out, the section of the 1985 plan concerning spousal waiver of the QPSA specifically states that it is effective January 1, 1985. When decedent died in December 1984, he therefore did not need plaintiff's consent in order to name a beneficiary other than her. The plan permits decedent's own waiver of the QPSA, except for the statutorily mandated amount of 50% of the account balance. Decedent's beneficiary designation, read in conjunction with the amended plan, thus entitles intervenor to one-half of the $190,000.

### IV. CONCLUSION

I will award 50% of the decedent's account to plaintiff on the basis of the QPSA requirement in the transitional rules. But I will also award 50% of the balance to intervenor because of his father's wish to name him as his beneficiary in case of death.