**Susan GALLAGHER, et al, Plaintiffs,**

**v.**

**PARK WEST BANK AND TRUST CO., Defendant and Third-party plaintiff,**

**v.**

**Carol A. GALLAGHER, Third-party defendant.**

Civil Action No. 94–30239–MAP.

United States District Court, D. Massachusetts.

March 27, 1996.

---

Kevin J. Loftus, East Longmeadow, MA, for plaintiffs.

Samuel A. Marsella, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, for defendant and third-party plaintiff.

Lawrence R. Ehrhard, Springfield, MA, for third-party defendant and counter-claimant.

*MEMORANDUM REGARDING OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT*

(Docket Nos. 11, 14 & 19)

PONSOR, District Judge.

This dispute arises out of defendant Park West Bank & Trust Co.'s ("Park West") administration of Edward Gallagher's estate. Plaintiffs (Gallagher's nine children from his first marriage), defendant (Park West), and third-party defendant (Gallagher's second wife) have filed cross motions for summary judgment. On January 5, 1996, Magistrate Judge Kenneth P. Neiman issued a comprehensive Report and Recommendation. *See* Report and Recommendation of Court on Cross Motions for Summary Judgment (D.Mass. Jan. 5, 1996). After *de novo* review, this court will adopt the magistrate judge's Report and Recommendation.

The parties' objections concern the proper interpretation of the Retirement Equity Act of 1984 ("REA"), 29 U.S.C. §§ 1052–1056, which amends the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The REA provides that in the event a vested participant in a pension benefit plan dies before retirement,

the plan must provide a qualified pre-retirement survivor annuity ("QPSA") to his or her surviving spouse. 29 U.S.C. § 1055(a)(2). In the case of an account plan such as Edward Gallagher's, a QPSA is defined as "an annuity for the life of the surviving spouse[,] the actuarial equivalent of which is not less than 50 percent of the portion of the account balance of the participant (as of the date of death) to which the participant had a nonforfeitable right." *Id.* at § 1055(e)(2). The annuity is automatic unless the participant elects to waive the QPSA, and the participant's spouse consents to the election. *Id.* at § 1055(c)(1). Edward Gallagher never made such an election; therefore his surviving spouse, Carol Gallagher, is at least a partial beneficiary of his pension plan, even though she was not explicitly so named. *See* Report and Recommendation at 13–18.

Park West seeks to push this conclusion one step further. It argues that Edward Gallagher's accrued benefits should be paid in full to Carol Gallagher, in the form of a single, lump-sum distribution. By operation of § 1055(a)(2), which names a surviving spouse as an automatic beneficiary, Park West contends the plan satisfies the criteria for a QPSA exemption,[1] entitling Carol Gallagher to the full amount of her late husband's accrued benefits.

■ This result would violate a cardinal rule of statutory interpretation: courts must give proper consideration and meaning to a statute's every word and phrase. *See U.S. v. Flores*, 968 F.2d 1366, 1371 (1st Cir.1992). The REA's general or default rule, found at § 1055(a)(2), requires the distribution of a QPSA from a pension plan *unless* the plan meets § 1055(b)(1)(C)'s exemption criteria, which Edward Gallagher's plan clearly does not. An exempt plan, as defined by § 1055(b)(1)(C), *explicitly* names and guarantees a surviving spouse full benefits, and therefore satisfies the purpose of the general rule—to ensure a minimum level of benefits to a surviving spouse. Park West's proposed interpretation merges a rule of general applicability (i.e., a surviving spouse must receive

1. In general, the QPSA provisions do not govern a participant's pension plan if (1) the plan provides that all vested benefits will be payable in full to a surviving spouse, and (2) the participant does not elect payment of benefits in the form of a life annuity. *See* 29 U.S.C. § 1055(b)(1)(C).

at least partial benefits from a plan) with one of its exceptions (i.e., no distribution of a QPSA where a plan explicitly provides for a full, lump-sum distribution to the surviving spouse), and would result in an unjustified windfall for Carol Gallagher.

■ The proper interpretation—construing § 1055(a)(2) and § 1055(b)(1)(C) as independent, alternative statutory provisions—in no way neutralizes the otherwise mandatory effect of the statute's default rule. On the contrary, unless it meets the § 1055(b)(1)(C) exemption criteria or another statutorily defined exception, a pension plan must provide for a QPSA, even where, as here, the plan has not been amended in compliance with the statute. *See generally Lefkowitz v. Arcadia Trading Ben. Pension Plan,* 996 F.2d 600, 603–04 (2nd Cir.1993) (holding QPSA provisions to be mandatory against unamended plan).

Plaintiffs add a wrinkle to the analysis. They contend that the QPSA provisions are not mandatory against an unamended plan where the surviving spouse has been married to the plan participant for less than one year. In other words, given the short marriage of Edward and Carol Gallagher, plaintiffs contend that Carol Gallagher is not entitled to *any* benefits from her husband's plan. For support, plaintiffs rely on 29 U.S.C. § 1055(f)(1), which provides that a plan may prohibit the distribution of a QPSA in cases where the participant and spouse have been married for less than one year prior to the participant's death.

■ Like Park West's proposed reading of the statute, plaintiffs' does not comport with common sense and sound reason. The statute does not indicate, in any way, that the QPSA provisions are presumptively ineffective in the case of a short-term marriage. Indeed, § 1055(f)(1) clearly states that a plan *may* provide for a short-term marriage limitation; it does not require one. In short, the REA contains no built-in bias against short-term marriages. Section 1055(f)(1) merely represents yet another exception to the default rule, effective upon a plan's affirmative incorporation of a length-of-marriage limitation.

■ Having determined that the QPSA provisions *do* apply in this case, the question becomes, how much is owed to Carol Gallagher? The magistrate judge cogently worked his way through this problem in his report. *See* Report and Recommendation at 18–22. To repeat, the plan at issue names Park West, in its capacity as trustee, to be the sole beneficiary. Under the REA, however, a surviving spouse must receive at least 50% of the deceased participant's accrued benefits. *See* 29 U.S.C. § 1055(a)(2), (e)(2). Accordingly, the proceeds must be divided evenly between the trustee bank and Carol Gallagher.

■ The court rejects Park West and Carol Gallagher's contention that the designation of Park West as a beneficiary is ineffective without Carol Gallagher's written consent. "There is no indication in the language of the [REA] or in its legislative history to demonstrate that Congress intended the absence of spousal consent to render ineffective the designation of beneficiaries other than spouses, particularly designations which were made prior to the adoption of the [REA]." *Art Builders Profit Sharing Plan v. Bosely,* 649 F.Supp. 848, 851 (D.Md.1986) (citing Senate report).

Under the terms of the trust instrument, the trustee bank must evenly divide its proceeds between Edward Gallagher's widow and children. Thus, by operation of the REA and the trust instrument, Carol Gallagher will receive 75% of the pension plan's proceeds, comprising the 50% due her under the REA and one half of the remaining 50% through the trust. This may or may not have been Edward Gallagher's final wish. However, it is not for this court, on these motions, to override the plain effect of the QPSA provisions, or to second-guess Edward Gallagher's efforts to arrange his estate. *See also* Report and Recommendation at 20–21.

The court has considered the parties' other objections and similarly finds no merit in them.

For these reasons, the court will ADOPT the magistrate judge's Report and Recommendation.

A separate order will issue.

*REPORT AND RECOMMENDATION OF
COURT ON CROSS MOTIONS FOR
SUMMARY JUDGMENT*

(Docket Nos. 11, 14 and 19)

NEIMAN, United States Magistrate
Judge.

## I. INTRODUCTION

This case involves the alleged improper
financial distribution by the Defendant Park
West Bank & Trust Co. of Edward R. Galla-
gher, Sr.'s retirement plan to his surviving
spouse Carol A. Gallagher, the Third Party
Defendant. Plaintiffs, Mr. Gallagher's nine
children from his first marriage, the Bank
and Mrs. Gallagher have each moved for
summary judgment. Pursuant to Rule 3 of
the Rules for United States Magistrates in
the United States District Court for the Dis-
trict of Massachusetts, the motions have
been referred to this Court for a Report and
Recommendation. See 28 U.S.C.
§ 636(b)(1)(B).

## II. FACTUAL AND PROCEDURAL BACKGROUND

There is no genuine dispute as to the
material facts of this case. On November 15,
1971, Edward R. Gallagher, Sr. ("Mr. Galla-
gher") executed an Indenture of Trust ("the
1971 Trust") designating Western Bank &
Trust Co., predecessor to the Defendant
Park West Bank & Trust Co. ("the Bank"),
as Trustee. Mr. Gallagher's nine children
from his first marriage ("Plaintiffs") were
named as beneficiaries of the 1971 Trust.

On September 12, 1978, Mr. Gallagher es-
tablished a retirement plan, executing an In-
strument of Adoption of a prototype Master
Retirement Plan and Trust for Self–Em-
ployed Individuals ("the 1978 Plan"). As
with the 1971 Trust, the 1978 Plan named the
Bank as Trustee and provided that, in the
event of Mr. Gallagher's death, its entire
value would be distributed to his beneficiary.
On September 28, 1978, Mr. Gallagher
named the Bank, in its capacity as Trustee of
the 1971 Trust, as beneficiary of the 1978
Plan. See Plaintiff's Submission of Exhibits,
Exhibit D. From 1978 until 1988, Mr. Galla-
gher made contributions to the 1978 Plan so
that, at the time of his death in March of
1991, it was worth over $170,000.

The 1978 Plan also established a mecha-
nism by which it could be amended. Accord-
ing to Article X, paragraph 1, of the 1978
Plan,

[t]he Trustee may amend any or all provi-
sions of this Master Retirement Plan and
Trust at any time without obtaining the
approval or consent of any Employer
which has adopted this Master Retirement
Plan and Trust provided that no amend-
ment shall authorize or permit any part of
the corpus or income of the Fund to be
used for or diverted to purposes other than
for the exclusive benefit of Members and
their beneficiaries.

In addition, Article X, paragraph 6, permits
the Trustee to amend the 1978 Plan to main-
tain its qualified status. Id., Exhibits B and
C.

On or about August 24, 1984, with refer-
ence to the 1978 Plan, the Bank submitted an
application to the Internal Revenue Service
("IRS") for approval of a master or prototype
defined contribution plan. See Defendant's
Exhibit 1. According to the application, the
Bank was replacing the prototype of the 1978
Plan with a Prototype Profit Sharing Plan
and Trust/Custodial Account ("PSP"). The
IRS, in an opinion letter dated August 1,
1985, advised the Bank that the PSP was
acceptable under Section 401 of the Internal
Revenue Code. See Defendant's Exhibit 2.
The IRS issued several subsequent opinion
letters concerning other minor prototype
amendments proposed by the Bank. Each
letter indicated that the Bank's proposed
amendment would not adversely affect the
acceptability of the pension plan under Sec-
tion 401 of the Internal Revenue Code. See
Defendant's Exhibits 4 and 6. Later, the
Third Party Defendant—who was eventually
paid by the Bank all of the proceeds of Mr.
Gallagher's plan—also received a notice from
the IRS, dated March 19, 1993, stating that
"your plan remains qualified under Section
401(a) of the Internal Revenue Code." De-
fendant's Exhibit 7.

In addition to the 1978 Plan itself, the IRS
opinion letters and the PSP, at least three
other documents are pertinent. First, the

Bank references a document, dated April, 1989 and entitled "Prototype Defined Contribution Plan and Trust/Custodial Account" ("DCP"), which provides that a plan participant's vested account balance will be paid to the surviving spouse upon the participant's pre-retirement death. Defendant's Exhibits 3 and 5. Second, the Plaintiffs reference a July, 1990 document, entitled "Model Summary Plan Description for use with the Simplified Adoption Agreements under the Prototype Defined Contribution Plan and Trust/Custodial Account" ("SPD"), which provides that if a participant is married, his beneficiary will automatically be his spouse. Plaintiffs' Exhibit Q. Neither the DCP nor the SPD, however, is signed by Mr. Gallagher, signed by a representative of the Bank, or accompanied by a signed amendment or acknowledgement of either the Bank or Mr. Gallagher.

The third document, the only one acknowledged by Mr. Gallagher, is entitled "Model Amendment 1 Compensation Limit Only." Model Amendment 1 refers to IRS Notice 88–131, provides that, effective in 1989, qualified pension plans could consider compensation only up to $200,000 in computing benefits. On May 12, 1989, the Bank sent a copy of Model Amendment 1 and a Statement of Plan Amendment to Mr. Gallagher and, on May 17, 1989, received his signed acknowledgement. Plaintiffs' Exhibits E, F and G.

Approximately, two years later, on January 11, 1991, Mr. Gallagher amended the 1971 Trust to designate the Third Party Defendant (then Carol H. Harrison)—whom he had known since 1968, when he was separated from his wife, and with whom he lived after his divorce in 1970—as a fifty percent beneficiary. Plaintiffs, together, were named the beneficiaries of the remaining fifty percent of the 1971 Trust. Three days later, on January 14, 1991, Mr. Gallagher married Ms. Harrison (hereinafter "Mrs. Gallagher") and, on January 17, 1991, executed a will dividing his residuary estate equally between his new wife and the Plaintiffs. Shortly thereafter, on March 22, 1991, Mr. Gallagher died.

On November 12, 1991, Mrs. Gallagher applied to the Bank for benefits from Mr. Gallagher's pension plan. In response, the Bank distributed to her the approximately $170,000 that had accumulated in the plan. Over one year later, on March 1, 1993, the Bank notified Plaintiffs that the proceeds of the pension plan had been distributed to Mrs. Gallagher. Plaintiffs immediately sent a letter to the Bank demanding payment of fifty percent of the proceeds of the pension plan. On June 3, 1993, the Bank advised Plaintiffs that the distribution to Mrs. Gallagher of the entire proceeds of the plan was proper. Sometime in 1993, the Bank also distributed the residuary of the 1971 Trust, approximately $25,000, equally between the Plaintiffs (fifty percent) and Mrs. Gallagher (fifty percent).

Plaintiffs filed their initial complaint in the Hampden County Superior Court. On September 14, 1994, the Bank filed a third party complaint against Mrs. Gallagher, who removed the action to this Court. Plaintiffs' complaint asserts two counts against the Bank. In Count I, Plaintiffs allege breach of the Bank's fiduciary duty and seek judgment against the Bank in an amount deemed fair and reasonable. In Count II, Plaintiffs seek treble damages pursuant to Massachusetts General Laws ch. 93A, § 2(a). Plaintiffs also seek attorney's fees and prejudgment interest. Plaintiffs, the Bank and Mrs. Gallagher have each filed motions for summary judgment. Although the Plaintiffs' motion seeks summary judgment as to Count I only, the motions filed by the Bank and Mrs. Gallagher seek summary judgment as to Counts I and II, as well as on Plaintiffs' request for attorneys fees.

### III. SUMMARY JUDGMENT STANDARD

The role of summary judgment in civil litigation is to pierce the boilerplate of the pleadings and assay the parties' proof in an effort to determine whether trial is actually required. *McIntosh v. Antonino*, 71 F.3d 29, 32–33 (1st Cir.1995) (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)). Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law. Fed. R.Civ.P. 56(c). See *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198, 201 (1st Cir. 1995); and *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994). Where, as here, there is an absence of a genuine dispute of material fact, motions for summary judgment can be resolved as a matter of law. See also *Jimenez v. Peninsular & Oriental Steam Navigation Co.,* 974 F.2d 221, 223 (1st Cir. 1992).

## IV. DISCUSSION

■ The resolution of the instant motions for summary judgment depends upon the Court's determination of three issues, first, whether the 1978 Plan was properly amended. If it was, Mrs. Gallagher was entitled to all the proceeds of Mr. Gallagher's pension plan, as distributed to her by the Bank, and Plaintiffs' claims must necessarily fail. If the 1978 Plan was not properly amended, the Court must then determine whether certain statutory spousal survivorship provisions nonetheless automatically apply to the 1978 Plan. These provisions may be found in the Retirement Equity Act of 1984 ("REA"), 29 U.S.C. §§ 1052–1056. Finally, if the REA controls, the Court must determine its application to the facts in this case, most specifically the extent of Mrs. Gallagher's and the Plaintiffs' respective rights to the pension proceeds. The Court addresses these issues in turn and concludes with a discussion of Plaintiffs' claims for Chapter 93A damages and attorneys' fees.[1]

## A. WHETHER THE 1978 PLAN WAS PROPERLY AMENDED

In their respective motions for summary judgment, both the Bank and Mrs. Gallagher argue that the 1978 Plan was properly amended in April of 1989. The 1989 plan prototype, referenced above as the DCP, contained spousal survivorship provisions, in accord with the REA, which would justify the distribution of the entire proceeds of the plan to Mrs. Gallagher by the Bank. Plaintiffs, on the other hand, claim that the 1978 Plan was not properly amended because neither the DCP nor the 1990 summary plan description, referenced above as the SPD, were ever properly adopted by the Bank or acknowledged by Mr. Gallagher. After careful analysis, the Court agrees with Plaintiffs.

ERISA provides, in applicable part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participant and beneficiaries and ... in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). See also *Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 32 (1st Cir.1991) (amendments to an employee welfare benefit plan "must be made in a manner prescribed by the [p]lan"). Accordingly, the Bank's power to amend the 1978 Plan must be evaluated in light of the plan's stated terms.

■ In this respect, as the Bank and Mrs. Gallagher assert, the 1978 Plan allows the Bank to make certain amendments "without obtaining the approval or consent" of Mr. Gallagher. The 1978 Plan also endows the Bank, as trustee, with the authority to amend the plan in order to maintain its qualified status. However, as indicated, the Bank did not formally amend the 1978 Plan so as to allow it to make the spousal distribution to Mrs. Gallagher in the manner it did. The Bank has provided no proof that either the DCP, the prototype which would have pro-

1. A threshold issue in many cases involving employee benefits is whether such benefits constitute a retirement plan under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). See, e.g., *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451 (1st Cir.1995). Here, however, the parties have jointly stipulated that the 1978 Plan was, at all times, an "employee pension benefit plan" within the meaning of ERISA. See Joint Stipulation of Fact. Although the Court is mindful that it is " 'not bound to accept as controlling, stipulations as to questions of law,' " *TI Federal Credit Union v. DelBonis,* 72

F.3d 921, 928 (1st Cir.1995) (quoting *Sanford's Estate v. Commissioner of IRS,* 308 U.S. 39, 51, 60 S.Ct. 51, 60, 84 L.Ed. 20 (1939)), as long as the Court accurately applies the appropriate legal principles, "the existence *vel non* of an ERISA plan is principally a question of fact." *Belanger,* 71 F.3d at 453. Accordingly, having discerned nothing to indicate otherwise, the Court accepts the parties' factual stipulation as true. See *TI Federal Credit Union,* 72 F.3d at 928 (" 'parties to a lawsuit are free to stipulate to factual matters' ") (quoting *Saviano v. Commissioner of IRS,* 765 F.2d 643, 645 (7th Cir.1985).

vided that Mr. Gallagher's vested pension be paid to his surviving spouse upon his death, or the SPD, which would have provided that his plan benefits go automatically to his spouse, were ever signed by the Bank or accompanied by a special amendment. See, respectively, Defendant's Exhibits 3 and 5 and Plaintiff's Exhibit Q. The lack of a formal amendment is fatal to the Bank's and Mrs. Gallagher's positions.

In addition, as indicated—except for Model Amendment 1 which dealt with contribution limits—the Bank has provided no proof that Mr. Gallagher, as the 1978 Plan's employer, ever formally adopted or acknowledged any amendment to the pension plan. Indeed, Model Amendment 1 and its accompanying documents manifest the Bank's awareness of its duty and its capability of obtaining the acknowledgement of plan participants when making substantial changes to pension plans. Moreover, the Bank required signed adoption agreements for similar amendments to the plans of other clients. See Plaintiffs' Exhibits X and Y.

Further, the Bank's own concern with the absence of a formal plan amendment can be found in at least three pieces of correspondence. Indeed, when read collectively, this correspondence demonstrates that, despite its current posture, the Bank recognized that Mr. Gallagher needed to formally acknowledge, if not adopt, amendments to his pension plan. First, in a letter dated January 23, 1993, Robert Gibowicz, the Bank's senior trust officer, wrote to Leon Sampla of the McKay Hochman Company ("McKay"), the Bank's plan provider, concerning a "problem we have for one of our clients' [sic] (deceased 3–22–91) that the amended adoption agreement for ... compliance with regard to our 8–1–95 Prototype Determination Letter was not executed." Plaintiffs' Exhibit R. Mr. Gallagher died March 22, 1991.

The problem concerning the non-execution of the amendment apparently was discovered during a routine audit of Mr. Gallagher's pension plan in response to an IRS inquiry. Id. Gibowicz's letter to McKay makes reference to the absence of both the "amended adoption agreement," presumably to have been signed by the Bank, and the "acknowl-edgement," presumably to have been signed by Mr. Gallagher. Because the Bank had to respond to the IRS by February 5, 1993, Gibowicz asked McKay to provide the Bank with "a general statement that your firm provides for its clients, the necessary documentation for ERISA compliance and obtains [sic] all Determination letters required of the IRS for Prototype users of the Pension Program. Anyother [sic] statement which you feel might be helpful would be greatly appreciated." Id. In light of Gibowicz' statement that the agreement "was not executed," the Court finds untenable the Bank's suggestion that the amended adoption agreement was "merely misplaced." See Bank's Motion for Summary Judgment at 9.

Second, in a response dated January 27, 1993, McKay vice president and chief counsel Richard Hochman ("Hochman") addressed the "problem" raised by Gibowicz. Hochman described in generic terms the actions his firm took in 1984 and 1985 in connection with the Bank's submission of prototype plans on behalf of its clients. See Plaintiffs' Exhibit S. Hochman indicated that certain plan amendments were made necessary by the 1984 enactment of the REA, that McKay received an opinion letter from the IRS dated August 1, 1985 concerning the Bank's proposed adoption agreements, and that all the IRS opinion letters, as well as "copies of the amended and restated plan document and the applicable adoption agreements," were forwarded to the Bank. Id. According to Hochman,

> [i]ncluded in that package were instructions on changes to the documents and how to complete the Adoption Agreements. Updated Summary Plan Descriptions were sent to you at a later date. As a part of the instruction package, *your institution was told that you had until July 31, 1986, to get all clients to re-execute the documents.* That date was later extended under various IRS Notices. You were kept abreast of those changes in our client Newsletter, *Prototype Plan News.*

Id. (emphasis added). As indicated, the Bank has provided no proof that the documents were re-executed, either by the Bank or Mr. Gallagher.

Third, in a letter dated February 4, 1993, Gibowicz reported to the IRS that, to the best of his knowledge, the Bank "has attempted to comply with all IRS requirements with regard to ERISA documentation and administration for all of its clients' [sic] and that through only an oversight and isolated case said amended document for the late Edward Gallagher cannot be located." Plaintiffs' Exhibit T. This letter, together with the two other letters previously described, evidences the Bank's knowledge that it was required to have its clients re-execute their pension plans and that neither the Bank nor Mr. Gallagher did so in ways germane to this case.[2]

The Court finds no merit in the Bank's and Mrs. Gallagher's claim that the 1978 Plan was properly amended simply because the Bank, between 1985 and 1990, received updated plan prototypes from McKay and favorable opinion letters from the IRS concerning the form of the prototype. Contrary to the Bank's assertions, the IRS letters implied, if not required, that Mr. Gallagher, as the employer, formally adopt the proposed amendments upon which the IRS gave its opinions. For example, a 1987 opinion letter from the IRS indicated that the Bank "must furnish a copy of this letter to each employer who adopts the [amendment], either as part of a new plan adoption or as an amendment to a prior adoption of your existing master or prototype profit-sharing plan." Defendant's Exhibit 6. Similarly, a 1990 IRS letter required the Bank to furnish a copy of the letter to each employer "who adopts this plan." Defendant's Exhibit 4. Finally, several of the IRS letters clearly stated that "*[a]n employer who adopts this plan* will be considered to have a plan qualified under Code section 401(a)...." See, e.g., Defendant's Exhibit 2 (emphasis added). In sum, there is insufficient evidence for a reasonable jury to infer that Mr. Gallagher's pension plan was ever formally amended to include spousal survivorship provisions.[3]

## B. WHETHER THE REA AUTOMATICALLY APPLIES TO AN UNAMENDED PLAN

The Court's finding that the 1978 plan was not properly amended does not end the matter. Both the Bank and Mrs. Gallagher argue in the alternative that the spousal survivorship provisions of the REA were automatically injected into the 1978 Plan. Upon exploring the intricacies of the REA, the Court finds that its spousal survivorship provisions were in fact mandatory and that such provisions applied to short-term spouses

---

2. Plaintiffs also refer to a fourth piece of correspondence, an October 14, 1987 letter from John W. Gibbons, a trust officer of the Bank, to Nadine Dandorf of McKay. That letter concerned the Bank's "self-employed HR–10 accounts," purportedly the type of account used by Mr. Gallagher, and asked McKay whether, after August 1, 1986, certain old adoption agreements should have been replaced by adoption agreement # 001. Written on the bottom of the letter is a note from Dandorf to the effect that copies of what Gibbons referred to as the Bank's "current files for self-employed HR–10 accounts" were from 1979 to 1981. According to Dandorf, "clients should've switched to 001 or 002 by 8–1–86. John G. said no one has done this. I informed him of problems and how to solve. He's just going to have clients sign now and hope they don't get audited." Plaintiffs' Exhibit U.

Although the Court does not agree with the Plaintiffs that this fourth letter "clearly shows that as late as 1987 there had been no compliance with the requirements of the 1984 REA," Plaintiffs' Memorandum of Law at 9, the Court does find that the correspondence at least demonstrates that something was amiss regarding adoption agreements. The Court also notes that neither the Bank nor Mrs. Gallagher have offered an alternative explanation for this correspondence.

3. IRS procedural rules also imply the necessity of employer adoption. Specifically Rev.Proc. 89–9, indicates that IRS opinion letters are issued to prototype plans that are "made available by a sponsoring organization ... for adoption by employers...." Id., §§ 3.01 and 3.02. Although Rev.Proc. 89–9 refers to Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA opinion letters"), such letters resulted from IRS approval of plans amended to incorporate not only the requirements of TEFRA, but also of the Deficit Reduction Act of 1984 ("DEA") and the REA. TEFRA opinion letters were issued by the IRS after July 18, 1985. See Rev.Proc. 89–9. Section 4.03 of Rev.Proc. 89–9 states that an employer who adopts a prototype plan and which received a favorable TEFRA opinion letter under a prior revenue procedure may continue to rely on such a letter provided that the plan's sponsor submit to the IRS an approved replacement plan by March 31, 1990 and provided that "the employer adopts the approved replacement plan" within a certain time period. Id.

such as Mrs. Gallagher. The Court finds, however, that Mrs. Gallagher's automatic annuity under the REA is limited to fifty percent of the pension plan's value.

The REA amended ERISA in 1984 in order to ensure that individuals whose spouses die before their retirement would nevertheless receive an annuity from their spouses' plans. According to the REA:

Each pension plan to which this section applies shall provide that—

\* \* \* \* \* \*

(2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

29 U.S.C. § 1055(a)(2).[4] An election to waive that annuity, to allow for the designation of another beneficiary by the plan participant, may be made only if the spouse consents. See 29 U.S.C. § 1055(c)(2).

Here, there is no dispute that Mrs. Gallagher never waived her spousal benefits. Accordingly, unless the spousal survivorship benefits of the REA are not mandatory or, as applied to the facts of this case, such benefits are available only to long-term spouses, Mrs. Gallagher is entitled to an annuity from her husband's pension plan.

The leading case with respect to the mandatory nature of the REA's spousal survivorship provisions is *Lefkowitz v. Arcadia Trading Co. Ltd. Ben. Pension Plan*, 996 F.2d 600 (2d Cir.1993). Its facts reveal the issue in the present matter. Shortly after Mrs. Lefkowitz initiated divorce proceedings, her husband executed a designation form naming his daughter as sole beneficiary of his pension plan. He died before the divorce was final, without amending his pension plan to incorporate the REA's spousal survivorship provisions. See 29 U.S.C. § 1055(a), (b), and (c)(2). In determining whether the wife was nonetheless entitled to spousal survivorship benefits, the Second Circuit held that the REA provisions applied to the pension plan even though the plan was not amended in accord with the REA to include the surviving spouse.

The Second Circuit based its decision on several factors: (i) Congress' intent that the REA provisions would be mandatory, not optional; (ii) expert opinion that such spousal benefits were automatic unless specifically and effectively waived; (iii) the right under ERISA for a plan beneficiary, such as a spouse claiming an annuity, to seek judicial enforcement of a benefit conferred by ERISA; and (iv) REA legislative history demonstrating Congressional intent to ensure its mandatory application to pension plans. The court feared that "to hold otherwise would permit recalcitrant administrators of pension plans to avoid providing spousal benefits simply by declining to amend their plans." *Id.* at 603–04.

The holding of *Lefkowitz* is clear and unambiguous and, in this Court's view, correct. Absent a spousal waiver, the REA's spousal survivorship benefit is mandatory, even if not formally adopted by a pension plan. Other courts have similarly concluded that the REA applied to unamended plans and that surviving spouses were entitled to plan benefits over the claims of named beneficiaries. See *Donohue v. Shell Provident Fund*, 656 F.Supp. 905 (S.D.Tex.1987); *Art Builders Profit Sharing Plan v. Bosely*, 649 F.Supp. 848 (D.Md.1986); *Binks Mfg. Co. v. Casaletto–Burns*, 657 F.Supp. 668 (N.D.Ill. 1986), *aff'd in part, rev'd in part without op.*, 822 F.2d 1090 (7th Cir.1987); and *Naddeo v. Officers and Employees Pension Plan of Laundry, Dry Cleaning & Dye Workers' Intern. Union*, 637 F.Supp. 82 (E.D.Pa.1986). See also Stephen Bruce, *Pension Claims: Rights and Obligations*, BNA, Washington, D.C., (2d ed. 1993) at 277 ("But when REA's amendments became effective with respect to the plan, the prior designation of a nonspousal beneficiary was overridden by operation of law, unless and until a new election of the nonspousal beneficiary was made with the

---

**4.** All references are to sections of ERISA as amended by the REA. As such, unless otherwise noted, the Court will not address arguments made under the Internal Revenue Code of 1954, 26 U.S.C. § 1 *et seq*, as the relevant sections are virtually identical to the ERISA sections discussed.

spouse's consent."). Since Mrs. Gallagher did not waive her REA benefits, she is otherwise entitled to receive an annuity.

The Plaintiffs do not dispute the basic holding of those cases, including *Lefkowitz*, which found the REA's spousal survivorship provisions mandatory. Rather, they attempt to distinguish these cases as applying only to long-term spouses. According to Plaintiffs, it was only after the *Lefkowitz* court identified Congress' desire "to protect 'long-term homemakers' rights to their spouses' retirement benefits,'" *id.*, 996 F.2d at 601 (quoting *Hurwitz v. Sher*, 982 F.2d 778, 781 (2d Cir.1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993), that it ruled that the spousal survivorship provisions were mandatory. Plaintiffs claim that where, as here, the participant and his spouse were married for only several months, the spouse should not be entitled to survivorship benefits.

The Court is not persuaded. Had Congress so desired, it could have made length of marriage a mandatory requirement. Unlike the language it utilized in 29 U.S.C. § 1055(a)(2), providing that a plan "shall provide" benefits to a surviving spouse, Congress instead chose to make a durational marriage limit optional. Thus, under 29 U.S.C. § 1055(f), a plan "may provide" for a one year marriage requirement. See also 26 U.S.C. § 417(d) ("[s]urvivor annuities *need not be provided* if participant and spouse married less than 1 year" (emphasis added)). A one-year durational marriage provision is hardly mandatory.

While this Court sees little problem requiring that the mandatory provisions of the REA be incorporated into an unamended pension plan, as in *Lefkowitz*, it is loathe to inject discretionary REA provisions into that same plan, despite Plaintiffs' assertions to the contrary. Moreover, Plaintiffs' argument has been considered and rejected by other courts. For example, in *Hurwitz*, the Second Circuit stated:

> [W]e cannot say that just because Congress intended to protect spouses who have been longterm partners, it meant to permit the casual disenfranchisement of newly-weds. As no legislative intent can

be discerned to exclude such spouses from the clear provisions of the statute, we will not exempt them by fiat.

*Id.*, 982 F.2d at 781. In short, the statutory language of the REA prevents this Court from unilaterally looking at the nature or length of the Gallaghers' marital relationship in order to determine Mrs. Gallagher's entitlement to benefits. As one court noted,

> § 205 of ERISA references "spouse" in terms of "spouse in such marriage." 29 U.S.C. § 1055(f)(2)(B). In *Kahn v. Kahn*, 801 F.Supp. 1237 (S.D.N.Y.1992), [*aff'd*, 2 F.3d 403 (1993)], an ERISA case, the Court concluded that "the common law meaning of 'spouse' is settled, straightforward, and dispositive: 'spouse' means a man or woman joined in wedlock, in short, one's husband or wife." *Id.* at. at 1241 (citing *Black's Law Dictionary* (5th Ed.1979) and *Webster's Third New International Dictionary* ).

*Davis v. College Suppliers Co.*, 813 F.Supp. 1234, 1237 (S.D.Miss.1993). See also *Binks Manufacturing Co.*, 657 F.Supp. at 668. Cf. *Naddeo*, 637 F.Supp. at 83 (nine months prior to his death and after his marriage to his second wife decedent designated son as beneficiary); and *Nelson v. Bank of Boston*, 699 F.Supp. 351, 353 (D.Mass.1988) (noting that, upon the participant's death, REA benefits "must be payable" to the surviving spouse unless the spouse consented to a different designation); *aff'd*, 879 F.2d 854 (1st Cir. 1989). In sum, the Court declines Plaintiffs' invitation to interpret the REA, as applied here, to automatically exclude a spouse of less than one year's duration.

## C. TO HOW MUCH OF THE PENSION PLAN IS MRS. GALLAGHER AUTOMATICALLY ENTITLED?

Under the REA, the surviving spouse is entitled to a "qualified preretirement survivor annuity" ("QPSA") unless the participant elects a different method of paying benefits. See 29 U.S.C. §§ 1055(a)(2) and 1055(b)(1)(C)(ii). In this case, the Bank claims—pursuant to paragraph 8.7 of the 1989 "amendment" to the pension plan, i.e., the DCP—that Mr. Gallagher made an election to distribute, not a QPSA, but the entire

balance of his retirement benefits to his wife. See Defendant's Motion for Summary Judgment at 10 n. 1.[5] As discussed, however, the Court has already concluded that the 1978 Plan was not formally amended by the Bank with respect to spousal survivorship benefits, let alone acknowledged by Mr. Gallagher. Accordingly, the percentage of pension proceeds to which Mrs. Gallagher is entitled must be resolved by looking, not at the 1989 "amendment," but at the REA.

■ Pursuant to the REA, the Court must determine whether the plan at issue is a "defined benefit plan" as defined in 29 U.S.C. § 1055(b)(1)(A)—thereby entitling Mrs. Gallagher to a QPSA as calculated under subsection 1055(e)(1)—or an "individual account plan or participant," as defined in subsection 1055(b)(1)(B) or 1055(b)(1)(C)—thereby entitling Mrs. Gallagher to a QPSA of only fifty percent of the benefits accrued. See 29 U.S.C. § 1055(e)(2). See *Profit Sharing Plan for Employees of Republic Financial Services v. MBank Dallas, N.A.*, 683 F.Supp. 592 (N.D.Tex.1988); *Art Builders Profit Sharing Plan*, 649 F.Supp. at 848; and *Lucaskevge v. Mollenberg*, 1989 WL 83197, *3–4 (W.D.N.Y.1989). Here, there is apparently no dispute that Mr. Gallagher's pension plan—be it the 1978 Plan, the PSP or the DCP—is an "other individual account plan" under subsection 1055(b)(1)(C). See Defendant's Motion, at 10 n. 1, and Plaintiffs' Response to Motions for Summary Judgment Filed by the Defendant and the Third Party Defendant (Docket No. 21) at 15–16. Accordingly, Mrs. Gallagher's annuity is fifty, not one-hundred, percent of the pension plan. 29 U.S.C. § 1055(e)(2). The remaining fifty percent should have gone to the beneficiary specifically named by Mr. Gallagher—the 1971 Trust. Since, in turn, Mrs. Gallagher was a one-half beneficiary of the 1971 Trust, she was, in effect, entitled to seventy-five percent of her husband's pension proceeds,

with twenty-five percent to be divided among the Plaintiffs.[6]

■ Despite this evident outcome, Plaintiffs nevertheless speculate that Mr. Gallagher may have taken other actions to benefit them more had the Bank provided him with notice of the spousal survivorship provisions in the prototype plan ("PSP") or a summary plan description ("SPD"). According to Plaintiffs, if such notice were given, Mr. Gallagher may have: (i) retired before his marriage and rolled the pension proceeds into his IRA, which would have then been paid into the 1971 Trust; (ii) amended the 1978 Plan to require a one year marriage period before payment of benefits; or (iii) obtained his spouse's consent to designate his children as beneficiaries of his pension plan. While the results would vary, under any of those scenarios, the total amount paid to the Plaintiffs would exceed the result called for by this Court's recommendation. Conversely, the Bank asserts that Mr. Gallagher may well have wanted his new wife to be the beneficiary of the entire value of his retirement plan. Indeed, Mrs. Gallagher has provided the Court with an affidavit confirming that assertion. See Mrs. Gallagher's Memorandum of Law (Docket 20), Exhibit G.

There is no reason for the Court to become entangled in such speculation, requiring, as it would, an examination of all aspects of Mr. Gallagher's estate planning, including his pension, the 1971 Trust and his will. Plaintiffs call for just such scrutiny, however, arguing that "[b]ecause Mr. Gallagher's expressed designation that his spouse and his children each receive, through the 1971 trust, 50 percent of his retirement plan proceeds is not consistent with the legislative policies underlying ERISA, the defendant is required to distribute the proceeds in accordance with that designation." The examination sought by the Plaintiffs, however, ranges far beyond their claims here—allegations of the Bank's

---

5. Indeed, the Bank's recognition that there was discretion in the "amended" plan to give Mrs. Gallagher more than fifty percent of the plan's proceeds undercuts the Bank's earlier argument that the REA's spousal survivorship provisions were completely nondiscretionary and that the only discretionary provisions of the plan had to do with eligibility requirements and employer

contributions. See Bank's Motion for Summary Judgment at 9.

6. As noted, the $25,000 previously in the 1971 Trust had already been divided evenly and, reportedly, the Trust terminated.

breach of its fiduciary duty under ERISA and the REA.

 Since personal trusts, such as the 1971 Trust, are not subject to ERISA, see 29 U.S.C. §§ 1001 and 1002, the Court will not apply any legislative policies underlying ERISA to the 1971 Trust. The 1971 Trust remained an independent document, no more incorporated into Mr. Gallagher's pension plan for purposes of analysis under ERISA or the REA than his estate, had it been designated the beneficiary of the 1978 Plan. Thus, even assuming that the Bank failed to provide notice to Mr. Gallagher, the mandatory provisions of the REA requiring spousal survivorship benefits are not nullified. In fact, Plaintiffs in the present matter agree that any failure by the Bank to notify Mr. Gallagher of prototype changes "does not alter the requirements of the REA amendments." Plaintiffs' Response at 17. The Court itself should not fashion a remedy based on the alleged failure of the Bank to fulfill its fiduciary duties. The REA has provided the answer. Like the plan participant in *Lefkowitz*, who likely had no notice of the REA's spousal survivorship provisions, the plan having terminated prior to the effective date of the REA, the Court must recommend that only those provisions of the REA which are mandatory apply to Mr. Gallagher's pension plan. *Lefkowitz*, 996 F.2d at 603–04.

### D. WHETHER PLAINTIFFS ARE ENTITLED EITHER TO CHAPTER 93A TREBLE DAMAGES OR ATTORNEYS' FEES

Plaintiffs' claim for treble damages pursuant to M.G.L. ch. 93A, § 2(a) (Count II) has not been briefed by any of the parties. As conceded by Plaintiffs at oral argument, however, that claim—assuming this Court has jurisdiction—is preempted by ERISA. As such, the Court recommends that Plaintiffs' Motion for Summary Judgment, as it pertains to Count II, be denied. Concomitantly, the Court recommends that the motions for summary judgment brought by the Bank and Mrs. Gallagher be allowed, insofar as they pertain to Count II. In addition, the Court recommends denying, without prejudice, any claim by Plaintiffs for attorneys' fees, as Plaintiffs concede that that issue is premature at this time. See Plaintiffs' Response at 17.

### V. CONCLUSION

For the reasons indicated above, the Court recommends, as to Count I, that Plaintiffs' motion for summary judgment be ALLOWED and that the motions for summary judgment brought by the Bank and Mrs. Gallagher be DENIED. Mrs. Gallagher was entitled only to fifty-five percent of the proceeds of Mr. Gallagher's pension plan. The remainder ought to have been disbursed to the 1971 Trust and divided pursuant to its provisions. As to Count II, the Court recommends that the Plaintiffs' motion be DENIED and that the Defendants' motions be ALLOWED. Finally, the Court recommends that Plaintiffs' motion, as it relates to attorneys' fees, be DENIED without prejudice to its formal pursuit in light of this Court's report and recommendation.[7]

Dated: January 5, 1996

---

7. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. See *Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); and *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983). See also *Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985), *reh'g denied*, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.